UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

John Wiley & Sons, Inc.,

              Plaintiff,

                            Civil Action No. 08 Civ. 7834
      -v.-                  (DCP)

Supap Kirtsaeng d/b/a
BlueChristine99, et al.,

              Defendants.

## OPINION

Plaintiff publisher, John Wiley & Sons, Inc. ("Wiley") brings this action claiming that Defendant Supap Kirtsaeng ("Kirtsaeng"),[1] and other unknown associates, violated the Copyright Act's (the "Act") prohibition of the unauthorized importation of goods subject to U.S. copyright and thereby infringed Wiley's exclusive right to distribute copies of its copyrighted works under section 106(3) of the Act. Specifically, Wiley alleges that Kirtsaeng and his associates purchased abroad foreign editions of Wiley textbooks and imported and resold them in the United States -- without Wiley's

---

[1] Kirtsaeng, in his resale of Wiley books on commercial websites, does business under the following names: BlueChristine99, BillyText, PinkyText, Sudchliew, Tubooks123 and PigVickey. (See Am. Compl. ¶ 16.)

authorization -- over the internet through websites including, but not limited to, eBay. Kirtsaeng responds that the "first sale" doctrine, codified as section 109(a) of the Act, provides a complete defense to Wiley's claims. He additionally raises the defenses of waiver and lack of standing.

As explained below, the court holds that the Act does not provide Kirtsaeng with any of these three defenses to this action.

## I. Background

The parties disagree as to the facts of this case; therefore, the court will attempt to fairly set forth the disputed and undisputed evidence.

Wiley publishes textbooks world-wide. In order to print and publish these textbooks, Wiley obtains, from the authors, assignment of the U.S. and foreign copyrights of reproduction and distribution. It is Wiley's practice, generally, to register these copyrights.

The design, quality, and prices of Wiley-copyrighted textbooks, however, allegedly vary depending on where they are published. According to Wiley, its U.S. editions, authorized for sale in the U.S., are "of the highest quality . . . generally printed with strong, hard-cover bindings with glossy protective coatings," and are often supplemented with CD-ROMs, access to educational websites, and study guides. (Am. Compl. ¶ 11.) The foreign editions, Wiley further asserts, though meant to be

2

"generally comparable in quality and appearance" to the U.S. editions, (Def.'s Ex. 1 at ¶ 2(c)) nonetheless "materially differ from the United States editions . . . [with] thinner paper and different bindings, different cover and jacket designs, fewer internal ink colors, if any, lower quality photographs and graphics, and generally lower prices . . . and often lack academic supplements . . . ." (Am. Compl. ¶ 12.) The foreign editions indicate on their front covers that they are a "Wiley International Student Edition[s]," "Wiley International Student Version[s]," or "Wiley Asia Student Edition[s]." (Pl.'s Exs. 10, 12, 14, 16, 18, 20, 22, 24.) On their back covers, the foreign editions state that they are either "authorized for sale in Europe, Asia, Africa and the Middle East only" or "authorized for sale in Asia only" and specifically affirm that

> This book . . . may not be exported. Exportation from or importation of this book to another region without the Publisher's authorization is illegal and is a violation of the Publisher's rights. The Publisher may take legal action to enforce its rights. The Publisher may recover damages and costs, including but not limited to lost profits and attorney's fees, in the event legal action is required.

(Pl.'s Exs. 10, 12, 14, 16, 18, 20, 22, 24.) In addition, while the foreign editions also specify that they were "Printed in Asia," these editions display notices of foreign copyright.[2] (Pl.'s Exs.

---

[2] The parties agree that the foreign editions had "notices stating that the books are copyrighted in the U.S." ([Revised] Joint Pre-trial Order, Sched. C, ¶ D.) The books, however, do not appear to bear U.S. copyright notices sufficient to satisfy the

["

to publish and sell its books in the United States.[4]

Kirtsaeng moved from Thailand to the U.S. in 1997 and obtained an undergraduate degree in mathematics. ([Revised] Joint Pre-trial Order, Sched. C, ¶ A.) According to Kirtsaeng, he thereafter moved to California to pursue a Ph.D. (Decl. of Supap Kirtsaeng in Opp. to Mot. for Attach. & Prelim. Inj. ¶ 2) which he ostensibly earned in 2009. (See Decl. of Supap Kirtsaeng in Opp. to Mot. for Contempt ¶¶ 6-7.)   During his stay in the U.S., Kirtsaeng received shipments[5] of Wiley foreign edition textbooks, printed abroad by Wiley Asia, "via UPS express and ocean freight" from "friends and family." ([Revised] Joint Pre-trial Order, Sched. C, ¶¶ B, C; id., Sched. C-2, ¶ 3.)   He then sold these textbooks on commercial websites, reimbursed his family and friends from the sales, and retained the profits from these sales to, among other things, pay for his education. (Id., Sched. C, ¶ C; id., Sched. C-2, ¶ 1; see also Decl. of Supap Kirtsaeng in Opp. to Mot. for Attach. & Prelim. Inj. ¶ 6.)   Kirtsaeng insists that, prior to his sales of textbooks, he consulted friends from Thailand as well as advice from a "Google Answers Researcher" to affirm the legality of the

---

[4] Kirtsaeng emphasizes that the "Reprint Agreement" with Wiley Asia "does not prohibit shipments from overseas into the United States." ([Revised] Joint Pre-trial Order, Sched. C-2, ¶ 8.)   However, the court finds this omission immaterial to its interpretation of the assignment contract.

[5] The parties agree that Kirtsaeng "did not *personally* bring books from overseas into this country." ([Revised] Joint Pre-trial Order, Sched. C, ¶ C.) (emphasis added).

sales. (See Decl. of Supap Kirtsaeng in Opp. to Mot. for Attach. & Prelim. Inj. ¶¶6-7; Def.'s Ex. 4; [Revised] Joint Pre-trial Order, Sched. C-2, ¶ 3.) Wiley alleges that Kirtsaeng sold numerous copies of the foreign editions of, at minimum, eight of its copyrighted works, amounting to "revenue of over $37,000" from these sales.[6] ([Revised] Joint Pre-trial Order, Sched. C-1, ¶¶ 2-3, 6.)

In September 2008, Wiley commenced this suit against Kirtsaeng claiming copyright infringement, under 17 U.S.C. § 501,[7] as well as trademark infringement and New York state claims for unfair competition.[8] (Am. Compl. ¶¶ 17-32.) Wiley requests a preliminary and permanent injunction, under 17 U.S.C. § 502(a) (2006),[9] and

---

[6] Wiley further claims that Kirtsaeng "had additional revenue from the sale of copies [of] Wiley's copyrighted works which he did not disclose in discovery" and "has provided incomplete evidence of expenses of his infringing sales." ([Revised] Joint Pre-trial Order, Sched. C-1, ¶¶ 7-8.)

[7] In accordance with section 501, the owner of a copyright "is entitled . . . to institute an action" against a copyright "infringer," that is, "[a]nyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 122 . . . , or who imports copies . . . into the United States in violation of section 602." 17 U.S.C. § 501(a)-(b).

[8] Plaintiff has since abandoned its trademark and unfair competition claims. (See [Revised] Joint Pre-trial Order.)

[9] Pursuant to section 502(a), a copyright owner may ask the court for "temporary and final injunctions on such terms as [the court] may deem reasonable to prevent or restrain infringement of a copyright." Id. § 502(a).

6

ِ ۚ

statutory damages, under 17 U.S.C. § 504(c).[10]  The parties have
concluded discovery, and this action is schedule for jury trial.

Kirtsaeng claims that he may raise the "first sale" doctrine
pursuant to 17 U.S.C. § 109(a), waiver, and standing as defenses to
Wiley's copyright infringement action.  Kirtsaeng's assertion of
these defenses raises legal issues the court must resolve.

## II. The "First Sale" Defense

Both parties have briefed the applicability of section 109(a)
to this case, and, thus, the issue is ripe for judicial decision.
Before addressing the issue, however, the court will discuss the
relevant provisions of the Act.

## A. Section 109(a) of the Act

In Bobbs-Merrill Co. v. Straus, 210 U.S. 339, 350-51 (1908),
the Supreme Court introduced the "first sale" doctrine, now
codified under 17 U.S.C. § 109(a), as a defense to a claim of

---

[10] Section 504(c) provides for statutory damages, at the
copyright owner's election:

to recover, instead of actual damages and profits, an
award . . . for all infringements involved in the
action, with respect to any one work, for which any one
infringer is liable individually, or for which any two
or more infringers are liable jointly and severally, in
a sum of not less than $750 or more than $30,000 as the
court considers just. . . .

Id. § 504(c)(1).  Higher damages may awarded if the copyright
owner can demonstrate that the defendant "willfully" infringed
the copyright. See id. § 504(c)(2).

7

copyright infringement.[11] <u>Bobbs-Merrill</u>, 210 U.S. at 350 ("The purchaser of a book, once sold by authority of the owner of the copyright, may sell it again, although he could not publish a new edition of it. . . . In our view the copyright statutes, while protecting the owner of the copyright in his right to multiply and sell his production, do not create the right to impose, by notice, such as is disclosed in this case, a limitation at which the book shall be sold at retail by future purchasers, with whom there is no privity of contract.").

Codifying this "first sale" defense, section 109(a) states, in pertinent part:

> Notwithstanding the provisions of section 106(3), the owner of a particular copy . . . lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy . . . .

Section 106 of the Act, referenced above in section 109, enumerates the "exclusive rights" in copyrighted works possessed by the copyright owner; subsection (3) provides the owner with the "exclusive" right "to distribute copies . . . of the copyrighted work to the public by sale or other transfer of ownership . . . ."

---

[11] Congress initially established the first sale doctrine as statutory law in 1909 as part of the Act. <u>See</u> Copyright Act of 1909, ch. 320, § 41, 35 Stat. 1075, 1084 (1909). In 1947, the Act was codified, <u>see</u> Copyright Act of 1947, ch. 391, § 27, 61 Stat. 652, 660 (1947), and in 1976 the Act was overhauled and the first sale statutory language materially changed to its current form. <u>See</u> Copyright Act of 1976, § 109, 90 Stat. 2541, 2548-49 (1976).

Id. § 106(3).  Violation of any of the section 106 "exclusive"
rights  constitutes  copyright  infringement,  and  subjects  the
infringer to civil liability under the Act.  See id. § 501(a)-(b).
However, pursuant to section 109, "*notwithstanding*" the copyright
owner's "exclusive" right to distribute its works, *an owner of a*
"*particular copy*" of the work *may dispose of that copy as he*
*pleases* without  subjecting  himself  to  liability.  Id. § 109(a)
(emphasis added).

**B. Section 602(a) of the Act**

     Section 602 of the Act complicates matters.  According to
section 602(a):

     (1) . . . Importation into the United States,
     without the authority of the owner of copyright under
     this title, of copies . . . of a work that have been
     acquired outside the United States is an infringement of
     the exclusive right to distribute copies or phonorecords
     under section 106, actionable under section 501. [12]

---

[12] Section 602(a)(3) provides three exceptions:

     (A) importation or exportation of copies . . .
     under the authority or for the use of the Government of
     the United States or of any State or political
     subdivision of a State, but not including copies . . .
     for use in schools . . . ;

     (B) importation or exportation, for the private
     use of the importer or exporter and not for
     distribution, by any person with respect to no more
     than one copy . . . of any one work at any one time, or
     by any person arriving from outside the United States
     or departing from the United States with respect to
     copies . . . forming part of such person's personal
     baggage; or

          (C) importation by or for an organization

17 U.S.C.A. § 602(a)(1) (2005 & Supp. 2009).[13]

## C. Quality King

The Supreme Court has explained the interaction of sections 109(a) and 602(a), holding that the importation of goods subject to U.S. copyright cannot constitute copyright infringement when the goods are *manufactured in the U.S.*, sold by the U.S. copyright owner to an entity abroad, and subsequently re-imported into the U.S. See Quality King Distribs. v. L'Anza Research Int'l, 523 U.S. 135, 145 (1998). According to the Supreme Court, once the U.S. copyright owner sold its goods, whether in the U.S. or otherwise, the first sale doctrine protected the subsequent owner of the goods from liability under the Act.[14]

_____

operated for scholarly, educational, or religious
purposes and not for private gain . . . .

Id. § 602(a)(3). Defendant has not argued that any of these exceptions apply to limit section 602 application.

[13] Section 602(a)(2) also prohibits such imports, without the owner's authorization, of copyrighted articles "the making of which either constituted an infringement of copyright, or which would have constituted an infringement of copyright if this title had been applicable. . . ." Notably, as long as a copyrighted work is "lawfully made," Customs has no authority to prevent its importation, id. § 602(b), but the infringer is nevertheless subject to a civil lawsuit for unauthorized importation.

[14] The Quality King plaintiff sold its product with U.S.-manufactured copyrighted labels in the United States and abroad, applying different advertising techniques and charging 35 to 40 percent lower prices on sales abroad. Quality King, 523 U.S. at 138-39. As to its domestic sales, Plaintiff L'anza sold "exclusively to domestic distributors who have agreed to resell within limited geographic areas and then only to authorized retailers such as barber shops, beauty salons, and professional

10

Quality King's reasoning hinges on the Supreme Court's reading
of the relevant sections of the Act.  The Court noted that section
602 "does not categorically prohibit the unauthorized importation
of copyrighted materials."  Id. at 144.   Rather, section 602
provides that "such importation is an infringement of the exclusive
right to distribute copies 'under section 106,'" the latter
statutory provision stating that all exclusive rights granted are
limited by the provisions 17 U.S.C. §§ 107 through 120 -- including
section 109(a), which "expressly permit[s] the owner of a lawfully
made copy to sell that copy 'notwithstanding the provisions of
section 106(3)."  Id.   Therefore, the Court reasoned

> After the first sale of a copyrighted item "lawfully
> made under this title," any subsequent purchaser, whether
> from a domestic or from a foreign reseller, is obviously
> an "owner" of that item. Read literally, § 109(a)
> unambiguously states that such an owner "is entitled,
> without the authority of the copyright owner, to sell"
> that item. Moreover, since § 602(a) merely provides that
> unauthorized importation is an infringement of an
> exclusive right "under section 106," and since that
> limited right does not encompass resales by lawful
> owners, the literal text of § 602(a) is simply
> inapplicable to both domestic and foreign owners of
> L'anza's products who decide to import them and resell

hair colleges."  Id. at 138.  The goods sold in foreign markets
"were manufactured by L'anza and first sold by L'anza to a
foreign purchaser."  Id. at 139.  Thereafter, the foreign-sold
goods "found their way back into the United States without the
permission of L'anza and were sold in California by unauthorized
retailers who had purchased them at discounted prices from
[Defendant] Quality King Distributors, Inc."  Id.

For the purposes of the decision, the Court assumed that
Quality King "bought all three shipments from the Malta
distributor, imported them, and then resold them to retailers who
were not in L'anza's authorized chain of distribution."  Id.

11

them in the United States. . . .

> The whole point of the first sale doctrine is that once
> the copyright owner places a copyrighted item in the
> stream of commerce by selling it, he has exhausted his
> exclusive statutory right to control its distribution.

Id. at 145, 152. As a consequence, "the owner of goods lawfully
made under the Act is entitled to the protection of the first sale
doctrine in an action in a United States court *even if the first
sale occurred abroad*." Id. at 145 n.14 (emphasis added).

Kirtsaeng argues that the holding in Quality King should be
extended to also cover *foreign-manufactured* goods. He urges the
court, when deciding whether a protected first sale has taken
place, to focus on whether the copyright owner has received its
"reward" for the sale. See Platt & Munk Co. v. Republic Graphics,
Inc., 315 F.2d 847, 854 (2d Cir. 1963) ("the ultimate question
embodied in the 'first sale' doctrine [is] 'whether or not there
has been such a disposition of the article that it may fairly be
said that the patentee [or copyright proprietor] has received his
reward for the use of the article'" (quoting United States v.
Masonite, 316 U.S. 265, 278 (1942))); Sebastian Int'l, Inc. v.
Consumer Contacts (PTY) Ltd., 847 F.2d 1093, 1098-99 (3d Cir.
1988). Because Wiley transferred its printing rights to Wiley Asia
for "financial consideration" and "profited on its assignment,"
Kirtsaeng concludes that the first sale doctrine applies.
([Revised] Joint Pre-trial Order, Sched. F-3, 26, 27.)

## D. Analysis

The precise issue confronting the court is as follows: is a U.S. importer[15] and/or subsequent distributor liable for copyright infringement, when this importer/distributor purchases foreign editions of U.S. copyrighted textbooks from a foreign company that manufactures and sells the textbooks pursuant to a geographically-specific assignment agreement, i.e., does the importation prohibition in section 602(a)(1) apply, despite a "first sale" abroad where the goods were lawfully made abroad rather than in the United States? For the following reasons, this court answers this question in the affirmative.

This is, however, a relatively close jurisprudential question. See 2 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 8.12[B][6] (Matthew Bender, Rev. Ed. 2009). Indeed, courts disagree as to the particular application of section 109(a) to fact patterns such as in this case. Compare Pearson Educ., Inc. v. Liao, No. 07-Civ-2423 (SHS), 2008 U.S. Dist. LEXIS 39222, at *8-12 (S.D.N.Y. May 13, 2008) (holding that section 109(a) does not apply to foreign-manufactured goods) and Omega S.A. v. Costco Wholesale Corp., 541 F.3d 982, 988-90 (9th Cir. 2008) (same)[16] with Pearson

---

[15] The court assumes, in its instant analysis, that Kirtsaeng imported the books covered by U.S. copyright.

[16] Columbia Broadcasting Sys., Inc. v. Scorpio Music Distribs., Inc., 569 F. Supp. 47, 49-50 (E.D. Pa. 1983), aff'd without opinion, 738 F.2d 421 (3d Cir. 1984) is the seminal case that refused to allow a first sale defense under section 109(a)

Educ., Inc. v. Liu, No. 1:08-cv-06152-RJH, 2009 U.S. Dist. LEXIS
88569, at *12-27 (S.D.N.Y. Sept. 25, 2009) (reading section 109(a)
as equally applying to U.S.- and foreign-manufactured goods, but
nonetheless refusing to allow a section 109(a) defense in light of
Quality King *dicta*) and Red Baron-Franklin Park, Inc. v. Taito
Corp., No. 88-0156-A, 1988 U.S. Dist. LEXIS 15735, at *9-10 (E.D.
Va. Aug. 29, 1988) (allowing 109(a) defense even when goods are
manufactured abroad) (discussing Sebastian, 847 F.2d at 1098 &
n.1), rev'd on other grounds, 883 F.2d 275 (4th Cir. 1989).[17]

As explained below, the court has reservations about the
wisdom of a bright-line rule in the application of section 109(a)
to this situation.  Cf. Campbell v. Acuff-Rose Music, Inc., 510
U.S. 569, 577-578 (1994) (refusing to institute a bright-line in

---

in the case of foreign-manufactured goods.  A host of cases have
followed the Scorpio reasoning, even post-Quality King. See,
e.g., Microsoft Corp. v. Big Boy Distrib. LLC, 589 F. Supp. 2d
1308, 1316-17 (S.D. Fla. 2008); Microsoft Corp. v. Cietdirect.com
LLC, No. 08-60668-CTV-UNGARO, 2008 U.S. Dist. LEXIS 61956, at
*13-15 (S.D. Fla. Aug. 5, 2008); Swatch S.A. v. New City Inc.,
454 F. Supp. 2d 1245, 1253-54 (S.D. Fla. 2006); U2 Home Ent'mt,
Inc. v. Lai Ying Music & Video Trading, Inc., No. 04 Civ. 1233,
2005 U.S. Dist. LEXIS 9853, at *15-16 (S.D.N.Y. May 25, 2005),
rev'd in part on other grounds, 245 F. App'x 28 (2d Cir. 2007);
UMG Recordings, Inc. v. Norwalk Distribs., Inc., No. SACV 02-1188
DOC (ANx), 2003 U.S. Dist. LEXIS 26302, at *11-14 (C.D. Cal. Mar.
13, 2003); Parfums Givenchy, 38 F.3d at 481-82; BMG Music v.
Perez, 952 F.2d 318, 319 (9th Cir. 1991); Lingo Corp. v. Topix,
Inc., No. 01 Civ. 2863 (RMB), 2003 U.S. Dist. LEXIS 1437, at *12-
13 (S.D.N.Y. Jan. 31, 2003).

[17] See also, e.g., Okocha v. Amazon.com, 153 F. App'x 849,
849-50 (3d Cir. 2005) (allowing section 109(a) defense to
Amazon.com's sale of books possibly manufactured abroad).

14

place of a case-by-case analysis as to section 107 of the Act).
Nevertheless, following the Supreme Court's *dicta* in <u>Quality King</u>,
the court reads section 109(a)'s language to render the "first
sale" defense unavailable to the goods manufactured in a foreign
country at issue here.

    i. **Statutory Language**

    "As with any question of statutory interpretation, [the
court's] analysis begins with the plain language of the statute."
<u>Jimenez v. Quarterman</u>, __ U.S. __, __, 129 S. Ct. 681, 685 (2009)
(citation and internal quotation marks omitted).  Section 109(a)
applies to copies "lawfully made under this title."  The dictionary
definition of "made" is relatively straight-forward -- "[p]roduced
or manufactured by constructing, shaping, or forming." <u>Webster's II
New Riverside University Dictionary</u> 713 (1988).  The court notes
the dictionary definitions of "under": "[s]ubject to" or "[w]ith
the authorization of." <u>Id.</u> 1256. <u>Accord</u> <u>Ardestani v. INS</u>, 502 U.S.
129, 134-35 (1991).  It follows, then, that the imported goods must
be manufactured "subject to" or "with the authorization of" the Act
in order for section 109(a) to apply.

    Using this plain language definition, however, there is still
some ambiguity as to relationship between "made" and "under this
title."  The phrase "lawfully made under this title" can still be
read either of two ways: (1) the goods must be made in a way that
is consistent with the authorization called for in the Act, in

which case the goods may be manufactured either domestically or internationally, or (2) the goods must be made within the control of U.S. law, that is, domestically only. See Liu, 2009 U.S. Dist. LEXIS 88569, at *13-14. Hence, the plain language, in the relevant sections of the Act, is at least ambiguous, and, consequently, the court turns to other methods of interpretation.

## ii. Statutory Context[18]

The structure of the Act also does not provide a determinative conclusion. Generally, "[a] term appearing in several places in a statutory text is [] read the same way each time it appears." Ratzlaf v. United States, 510 U.S. 135, 143 (1994). Many provisions use the terms "lawfully made under this title"[19] as well

_____

[18] "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." Davis v. Mich. Dep't of Treasury, 489 U.S. 803, 809 (1989).

[19] See also, e.g., 17 U.S.C. § 109(c) ("Notwithstanding the provisions of section 106(5), the owner of a particular copy lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to display that copy publicly . . . ."), 109(e) ("Notwithstanding the provisions of sections 106(4) and 106(5), in the case of an electronic audiovisual game intended for use in coin-operated equipment, the owner of a particular copy of such a game lawfully made under this title, is entitled, without the authority of the copyright owner of the game, to publicly perform or display that game . . . ."), 110 ("the following are not infringements of copyright . . . performance or display of a work by instructors or pupils in the course of face-to-face teaching activities of a nonprofit educational institution, in a classroom or similar place devoted to instruction, unless . . . the performance, or the display of individual images, is given by means of a copy that was not lawfully made under this title, and that the person responsible for the performance knew or had reason to believe was

16

as "under this title."[20]  Whereas, perhaps, the latter term does not

---

not lawfully made."), 1001(7), 1006(a) (an "interested copyright party" is entitled to royalties from those importing and selling certain recordings which contain those of its works "*lawfully made under this title*.") (emphasis added). Compare *id.* § 112(g) ("The transmission program embodied in a copy or phonorecord *made under this section* is not subject to protection as a derivative work under this title") (emphasis added).

   [20] See, e.g., 17 U.S.C. §§ 104(a) ("The works specified by sections 102 and 103, while unpublished, are subject to protection *under this title* without regard to the nationality or domicile of the author"), 106 ("Subject to sections 107 through 122, the owner of copyright *under this title* has the exclusive rights to do and to authorize any of the following . . . ."), 112(g), 113(b) ("This title does not afford, to the owner of copyright . . . any greater or lesser rights . . . *under the law*, whether title 17 or the common law or statutes of a State . . . as held applicable and construed by a court in an action brought *under this title*."), 114(a)(4)(B) ("Nothing in this section annuls or limits in any way . . . remedies available *under this title*"), 201(e) ("When an individual author's ownership of a copyright, or of any of the exclusive rights under a copyright, has not previously been transferred voluntarily by that individual author, no action by any governmental body or other official or organization purporting to seize, expropriate, transfer, or exercise rights of ownership with respect to the copyright, or any of the exclusive rights under a copyright, shall be given effect *under this title*, except as provided *under title 11*"), 203(b) ("Upon the effective date of termination, all rights *under this title* that were covered by the terminated grants revert to the author"), 301(c) ("no sound recording fixed before February 15, 1972, shall be subject to copyright *under this title* before, on, or after February 15, 2067."), 304(c)(6)(E) ("Termination of a grant *under this subsection* affects only those rights covered by the grant that arise *under this title*, and in no way affects rights arising under any other Federal, State, or foreign laws."), 502(a) ("Any court having jurisdiction of a civil action arising *under this title* may . . . grant temporary and final injunctions"), 601(d) ("Importation or public distribution of copies in violation of this section does not invalidate protection for a work *under this title*."), 702 ("All regulations established by the Register *under this title* are subject to the approval of the Librarian of Congress.") (emphasis added).

necessarily refer to the place of manufacture, see Liu, 2009 U.S.
Dist. LEXIS 88569, at *15-16, it is not conclusively apparent that
provisions containing the former phrase similarly do not.

On the one hand, when Congress wishes to limit protection
under the Act based on place of manufacture, it does so clearly.
See 17 U.S.C. §§ 401(a), 601; Sebastian, 847 F.2d at 1098 n.1.
However, in section 104(b) of the Act, Congress used different
terminology to indicate protection pursuant to the Act for certain
U.S. copyrighted works, regardless of place of manufacture: "[t]he
works specified by sections 102 and 103 [i.e., works covered by the
Act] are subject to protection under this title if . . . (2) the
work is first published in the United States or in a foreign nation
that, on the date of first publication, is a treaty party . . . ."
17 U.S.C. § 104(b) (emphasis added).  That is, Congress knows how
to and has specifically phrased the extension of protection under
the Act -- for manufacture consistent with the Act's requirements
in order to merit the Act's protection -- as opposed to lawful
manufacture under the Act. At the same time, a geographic-specific
interpretation of section 109 comports with the general rule that
the Act does not have extraterritorial operation. Update Art, Inc.
v. Modiin Publ'g, Ltd., 843 F.2d 67, 73 (2d Cir. 1988). Compare
Quality King, 523 U.S. at 145 n.14 (indicating that, as long as the
goods are lawfully made under the Act, first sales abroad do not

18

involve extraterritorial application of the Act).[21]    Thus the
statutory context does not resolve the issue.

### iii. Legislative History

The legislative history surrounding sections 109 and 602 is
also inconclusive.  For example, in 1976, Congress, except with
regard to copies irrelevant to this dispute, repealed the section
of the Act preconditioning U.S. copyright protection on manufacture
in the U.S. See H.R. Rep. No. 94-1476 (1976), reprinted in 1976
U.S.C.C.A.N. 5659, 5780-85.    Congress then banned imports of
certain copyrighted materials.  Some suggested that the ban only
extend to "piratical copies."  The 1961 Register's Report noted

> When arrangements are made for both a U.S. edition
> and a foreign edition of the same work, the publishers
> frequently agree to divide the international markets. The
> foreign publisher agrees not to sell his edition in the
> United States, and the U.S. publisher agrees not to sell
> his edition in certain foreign countries. It has been
> suggested that the import ban on piratical copies should
> be extended to bar the importation of the foreign edition
> in contravention of such an agreement.
>
> Some countries, including the United Kingdom, bar
> importation in this situation, apparently on the ground
> that, even though the copies were authorized, their sale
> in violation of a territorial limitation would be an

---

[21] Courts should be "hesitant to adopt an interpretation of a
congressional enactment which renders superfluous another portion
of that same law." Kawaauhau v. Geiger, 523 U.S. 57, 62 (1998)
(citation and internal quotation marks omitted).  While the court
does not necessarily agree that with other courts that section
109(a) could, in combination with the Supreme Court's Quality
King holding, completely subsume section 602(a), see BMG Music,
952 F.2d at 319-20, it is troubled by limiting section
602(a)(1)'s application to bailees and similar possessors of
copyrighted goods given the section's broad language.

> infringement of the copyright. In the United States, there is no clear decision as to whether the sale of authorized copies beyond a territorial limitation is an infringement. But the import ban on "piratical copies" does not seem to apply to authorized copies.
>
> We assume, without considering the antitrust questions involved, that agreements to divide international markets for copyrighted works are valid and [enforceable] contracts as between the parties. But we do not believe that the prohibition against imports of piratical copies should be extended to authorized copies covered by an agreement of this sort. To do so would impose the territorial restriction in a private contract upon third persons with no knowledge of the agreement. And even as between the parties, Customs does not seem to be an appropriate agency for the enforcement of private contracts.

Copyright Law Revision: Report of the Register of Copyrights on the General Revision of the U.S. Copyright Law, 87th Cong., 1st Sess., 125-126 (H. R. Judiciary Comm. Print 1961). Thus, the Register's Report recommended *against* extending the Act to protect the market-allocation contracts. However, Congress, in crafting subsections (a) and (b) of section 602, did *not* limit the Act's prohibition merely to "piratical copies."[22] Arguably, by implication, Congress

---

[22] As the Supreme Court in Quality King noted, when discussing the drafting of the 1976 Act, some Congressmen in fact were concerned about foreign manufacturers breaking contracts and selling foreign-made U.S. copyrighted materials in the United States. See Copyright Law Revision Part 4: Further Discussions and Comments on Preliminary Draft for Revised U.S. Copyright Law, 88th Cong., 2d Sess., 119 (H. R. Judiciary Comm. Print 1964) (statement of Mrs. Pilpel) ("For example, if someone were to import a copy of the British edition of an American book and the author had transferred exclusive United States and Canadian rights to an American publisher, would that British edition be in violation so that this would constitute an infringement under this section?"); see also id., at 209 (statement of Mr. Manges) (the situation is "a troublesome problem that confronts U.S. book

intended to statutorily enforce geographically-limited assignment and license agreements.

But the 1976 House Report's explanation of section 109(a) did not mention the place of manufacture of U.S.-copyrighted materials and, instead, generally stated that "where the copyright owner has transferred ownership of a particular copy . . . of a work, the person to whom the copy . . . is transferred is entitled to dispose of it by sale, rental, or any other means." H.R. Rep. No. 94-1476 at 79, reprinted in 1976 U.S.C.C.A.N. at 5693. Further, according to the House Report, "[t]his does not mean that conditions on future disposition of copies . . . imposed by a contract between their buyer and seller[] would be unenforceable between the parties as a breach of contract, but it does mean that they could not be enforced by an action for infringement of copyright." Id. Thus, it appears that Congress, in some circumstances, would leave the enforcement of distribution agreements to the parties involved.

Additionally, it is unclear whether Congress intended the language provided in section 109(a) to limit, rather than simply to codify, Bobbs-Merrill's elucidation of the "first sale" principle. Quality King, 523 U.S. at 152 ("There is no reason to assume that

---

publishers frequently"; "Now it's alright to say, 'Let the American publisher protect his right by an action for breach of contract,' but that isn't so easy. In the first place it is almost always impractical financially. And, second of all, it is extremely difficult and sometimes impossible to find out who is the person that should be sued.").

Congress intended either § 109(a) or the earlier codifications of the doctrine to limit its broad scope.").    Therefore, reading section 109(a) to limit the reach of the right of first sale could be an artificial exercise.

### iv. Public Policy

Likewise, the policy behind the Act supports either interpretation of section 109(a).    Persuasive policy arguments exist for the expansive reach of section 109(a).    For example, in common law and in the Uniform Commercial Code, the validity of sales of goods does not depend upon place of manufacture. See 2 Nimmer on Copyrights § 8.12[B][6][a] & n. 110 (noting Cosmair, Inc. v. Dynamite Enters., No. 85-0651-Civ-Hoeveler, 1985 U.S. Dist. LEXIS 20922, at *9-10 (S.D. Fla. Apr. 9, 1985)).    Similarly, the policy behind the first sale itself, reflecting the hesitancy to allow a seller to "impose . . . a limitation at which the book shall be sold at retail by future purchasers, with whom there is no privity of contract," Bobbs-Merrill, 210 U.S. at 350, is equally as applicable to goods manufactured in the U.S. as to foreign-manufactured goods. See also Liu, 2009 U.S. Dist. LEXIS 88569, at *17.

However, other considerations point the court in the opposite direction.    The Act serves to protect a U.S. copyright holder from infringing imports and sales of products subject to its U.S. copyright, insofar as these imports and sales do not occur with its

authorization or by operation of law. In contrast to its "first sales" in the United States, Bobbs-Merrill, 210 U.S. at 350 ("one who has sold a copyrighted article, without restriction, has parted with all right to control the sale of it"), a U.S. copyright holder is instead one step removed from the first sale abroad. Although a U.S. copyright holder does have a cause of action against a licensee foreign manufacturer, should said manufacturer choose to import the manufactured goods or sell to an unauthorized distributor, the same cannot be said for those to whom the manufacturer sells its goods. No privity of contract exists between the manufacturer and the subsequent buyer of the goods. In such a case, a foreign distributor can act, for its own advantage, as an arbitrageur and effectively bypass the contractual agreement by selling the goods in the U.S. market. Given the 1976 *increased* protection afforded U.S. copyright holders who decide to print abroad, it would not seem consistent with Congressional intent to retrench U.S. copyright holder's rights in this manner.

Furthermore, the Act should not be read to limit access to copyrighted materials.[23]  If Kirtsaeng's position were adopted, U.S.

---

[23] Second- or third-degree geographic price discrimination can impose an "export subsidy" on U.S. consumers and encourage rent-seeking behavior and the use of government resources to protect against arbitrage. See Michael J. Muerer, Copyright Law and Price Discrimination, 23 Cardozo L. Rev. 55, 143-44 (2001). Yet in the case of goods arguably of high social utility, the overall social benefits of increasing access to such goods abroad by selling these goods at lower prices in foreign markets may outweigh the costs. Cf. id. at 144 (discussing prescription

copyright holders would have less incentive to license the printing of lower-priced editions in foreign countries as they would, in effect, lose U.S. copyright protection for, and profits on, their higher-priced U.S. works. Within the context of U.S. cooperation by way of copyright treaties with other countries, including Thailand,[24] and the potential to disrupt the availability of U.S. copyrighted educational and other literary materials in foreign nations, the court is uncomfortable with a result that limits the protection of the U.S. copyright holder. The intent of copyright protection seems to be, fundamentally, to encourage, rather than discourage, the broad publication of U.S.-copyrighted works.

### v. Quality King *Dicta*

Ultimately, the court is persuaded by the *dicta* in Quality King, which would limit section 109(a)'s coverage to U.S.-manufactured goods. The Court stated that "§ 602(a) [would] appl[y] to a category of copies that are neither piratical nor 'lawfully made under this title.'" Quality King, 523 U.S. at 147. This particular category "encompasses copies that were 'lawfully

___

drugs); R. Polk Wagner, Information Wants to Be Free: Intellectual Property and the Mythologies of Control, 103 Colum. L. Rev. 995, 1027 (2003) (discussing "informational" goods).

[24] The United States and Thailand, as members of the World Trade Organization, are members of the TRIPS (Trade-Related Aspects of Intellectual Property Rights) Agreement. See World Trade Organization, Understanding the WTO: the Organization, Members and Observers http://www.wto.org/english/thewto_e/whatis_e/tif_e/org6_e.htm (last visited Oct. 13, 2009).

made' not under the United States Copyright Act, but instead, under the law of some other country." Id.

Based upon its analysis of the language of the 1961 Register's Report, see supra, as well as a subsequent 1964 panel discussion on market allocation agreements, the Court reasoned

> Even in the absence of a market allocation agreement between, for example, a publisher of the United States edition and a publisher of the British edition of the same work, each such publisher could make lawful copies. If the author of the work gave the exclusive United States distribution rights -- enforceable under the Act -- to the publisher of the United States edition and the exclusive British distribution rights to the publisher of the British edition, however, presumably only those made by the publisher of the United States edition would be "lawfully made under this title" within the meaning of § 109(a). The first sale doctrine would not provide the publisher of the British edition who decided to sell in the American market with a defense to an action under § 602(a) (or, for that matter, to an action under § 106(3), if there was a distribution of the copies).

Id. at 148 (footnote omitted). Thus, the Court indicated that only books manufactured and published in the United States are "lawfully made" under U.S. law and subject to the "first sale" defense provided in section 109.

Although the Second Circuit has not analyzed the exact circumstances as those currently before the court, a majority of courts addressing this issue have reached conclusions consistent with the Quality King dicta and contrary to Kirtsaeng's position. See supra note 16; Liu, 2009 U.S. Dist. LEXIS 88569, at *23-27 (following Quality King despite disagreement with its interpretation of sections 109(a) and 602(a)); 2 Nimmer on

25

Copyright § 8.12[B][6][c]. But see supra note 17; Red Baron, 1988
U.S. Dist. LEXIS 15735, at *9-10; Sebastian, 847 F.2d at 1098
(expressing disapproval of Scorpio analysis); Cosmair, Inc., 1985
U.S. Dist. LEXIS 20922, at *9-10 (same).

Quality King thus determines the appropriate outcome in this
case.  Accordingly, the court concludes that the Supreme Court's
unambiguous language, though dicta, is sufficient to resolve the
uncertainties in interpreting the Act.  Although this is perhaps an
imperfect  solution,  given  the  valid  concerns  raised  in  both
readings of sections 109 and 602, the court nonetheless will not
extend section 109(a) to cover foreign-manufactured goods.[25]

---

[25] Despite the reasoning in Quality King, the court is
concerned about the institution of a bright-line rule here, if
such a rule is taken to its logical conclusion.  Should "lawfully
made under this title" apply only to domestically-manufactured
goods, this results in the phenomenon that, once imported, the
goods manufactured abroad could provide the U.S. copyright holder
with never-ending section 106(3) "exclusive distribution"
protection against any subsequent sale, no matter how legitimate.
See 2 Nimmer on Copyrights § 8.12[B][6][a].  In other words,
every time the owner of the imported goods sold such goods, he or
she would be subject to liability for copyright infringement
regardless of how far that sale is removed from the first sale
after importation.  Some courts have limited the extent of
liability for illegal importation, pursuant to section 602(a), to
those involved in the first U.S. sale, see, e.g., Parfums
Givenchy, 38 F.3d at 481, or merely those importing the goods.
See, e.g., Enesco Corp. v. Jan Bell Mktg., 992 F. Supp. 1021, 1023
(N.D. Ill. 1998). The latter interpretation is more in line with
the language of section 602(a). See infra note 24.  But these
cases do not explain how section 106(3) liability could be
cabined, and, indeed, the court can find no statutory support for
imposing such a limitation.
    However, the court does not have before it the particular
question as to how far liability for violations of these sections
could extend, but notes that the extension of such liability is

26

## E. Application

There is no indication that the imported books at issue here were manufactured pursuant to the U.S. Copyright Act nor has Kirtsaeng presented any evidence on this issue. To the contrary, the textbooks introduced as evidence purport, on their face, to have been published outside of the United States. In addition, the assignment provides Wiley Asia only the rights to print, publish, and sell the textbooks in the territories, thus giving Wiley Asia, at best, copyrights under the laws of the countries existing within the territories. Wiley itself has retained all U.S. copyrights -- as a consequence, the imported textbooks at issue could not have been manufactured "under" Title 17 of the U.S. Code. Thus, should Plaintiff establish his case, Kirtsaeng may not rely on a first sale and therefore may incur liability for violation of section 602(a)[26] and/or section 106(3).

---

not so absurd a result so as to counsel the court to ignore the *dicta* in Quality King. Further, individual importers and users of copyrighted materials printed abroad have some defenses available to a U.S. copyright holder's action. See, e.g., 17 U.S.C. § 107; id. 602(a)(2).

[26] The plain language of section 602(a) only prevents unauthorized "importation" of U.S. copyrighted works. 17 U.S.C. § 602(a). "Importation" is defined as "[t]he bringing of goods into a country from another country." Black's Law Dictionary 824 (9th ed. 2009). Accord Webster's II New Riverside University Dictionary 614; Enesco Corp., 992 F. Supp. at 1023. A defendant can nevertheless be held vicariously liable for copyright infringement if the defendant has (1) a "right and ability to supervise" infringing conduct and (2) an "obvious and direct financial interest . . . ." Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc., 118 F.3d 955, 971 (2d Cir. 1997)

### III. Kirtsaeng's Remaining Arguments in Support
of a "First Sale" Defense

Kirtsaeng also asserts that Wiley's assignment of its Asian
copyrights to Wiley Asia deprives Wiley of its right to enforce its
section 106(3) exclusive U.S. distribution rights.    Kirtsaeng
appears to make two arguments here: (1) that Wiley "waived" its
rights to exclusive distribution in the U.S. when it assigned the
Asian copyright in an agreement that did not prohibit importation
into the U.S. and (2) that somehow Wiley's assignment to Wiley Asia
constituted a "first sale" pursuant to section 109(a).    The court
has already disposed of Wiley's first argument by reading the
Reprint Agreement to prevent sales of foreign editions outside of
the   territories,   thereby   preserving   Wiley's   exclusive   U.S.
distribution rights.    Because Kirtsaeng has produced no evidence
other than Wiley's Reprint Agreement, Kirtsaeng's waiver argument
has no substance.    As a matter of law, therefore, Kirtsaeng's
waiver argument fails on the record before the court.

Kirtsaeng's second argument also fails.    The Second Circuit
has, in certain circumstances, held that a license to use a U.S.

---

(quoting *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d
304, 307 (2d Cir. 1963)); *see also* 3 *Nimmer on Copyright* §
12.04[A][2].    Similarly, liability for contributory infringement
involves participation in actions that contribute to
infringement. *Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d
693, 706 (2d Cir. 1998); *Gershwin Publ'g Corp. v. Columbia
Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971); 3 *Nimmer
on Copyright* § 12.04[A][3].    The court leaves Plaintiff to prove,
at trial, Kirtsaeng's section 602(a) liability.

copyright can amount to a first sale. See Bourne v. Walt Disney Co., 68 F.3d 621, 631-33 (2d Cir. 1995). In Bourne, the plaintiff granted Disney "various licenses to copyrighted compositions." Id. at 631. Plaintiff Bourne objected to Disney's "right to sell or publicly distribute the videocassettes that it produced." Id. The court ruled that the license agreement protected Disney under the first sale doctrine to "transfer the resulting videocassettes as it sees fit." Id. at 632. However, the Bourne license agreement did not contain a limit on sales and distribution, and instead granted Disney broad rights to the copyrighted materials. Id. at 624-25 (license agreement granted Disney "the right to record . . . such music . . . the right to ship, import and export . . . any and all such mechanical recordings throughout the world, but only in connection with [Disney's] pictures. . . .") (italics omitted). Further, because all the transactions and manufacturing of the videos at issue took place in the United States, the issue of the section 109 language never arose.[27]   As such, Bourne does not

---

[27] The relevant license agreements were executed prior to the 1976 statutory revision. The pre-1976 language provided that "nothing in this Act shall be deemed to forbid, prevent, or restrict the transfer of any copy of a copyrighted work *the possession of which has been lawfully obtained.*" Copyright Act of 1909 § 41, 35 Stat. at 1084; Copyright Act of 1947 § 27, 61 Stat. at 660 (emphasis added). Clearly, Disney lawfully obtained the videos it created pursuant to the copyright license, so Disney satisfied the requirements. Moreover, section 101 of the Act now defines "transfer of copyright ownership" as including "an assignment . . . [or] exclusive license . . . ." 17 U.S.C. § 101. This language materially differs from section 109(a) which applies to "the *owner of a particular copy* . . . lawfully made

29

control this case.

## IV. Standing

Finally, Kirtsaeng reasons that Wiley lacks standing to bring this action, and that the true party in interest here is Wiley Asia. ([Revised] Joint Pre-trial Order, Sched. F-2, ¶ 2.)  This argument is also without merit.  The issue is the importation -- not the exportation -- of the books for sale in the U.S., and therefore the pertinent issue in this action is whether the U.S. copyright was infringed upon.  Wiley, who, despite its assignment of Asian copyrights to Wiley Asia, is still the owner of the U.S. copyright and has standing to sue Kirtsaeng for infringement.

---

under this title." Id. § 109(a) (emphasis added).  Section 202 also notes the distinction between the transfer of copyright ownership and the transfer of a particular copy of a work subject to copyright. See id. § 202.

## V. Conclusion

In light of the court's analysis, described above, of Kirtsaeng's proposed defenses in this action, it is hereby:

- ORDERED that Kirtsaeng is prohibited as a matter of law from raising a defense pursuant to the "first sale" doctrine; and it is hereby

- ORDERED that Kirtsaeng is prohibited as a matter of law from raising a defense pursuant to waiver; and it is hereby

- ORDERED that Kirtsaeng is prohibited as a matter of law from raising a defense claiming lack of plaintiff's standing to bring this lawsuit.

Donald C. Pogue, Judge[28]

Dated:    October 19, 2009
          New York, New York

---

[28] Judge Donald C. Pogue of the United States Court of International Trade, sitting by designation.

31