**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| John Wiley & Sons, Inc.　　　　　　　　　Plaintiff,　　　　　　v.　　Supap Kirtsaeng　　　　　　　　　Defendant. | :<br>:<br>:<br>:<br>: Civil Action No. 08-cv-7834-DCP<br>:<br>:<br>:<br>:<br>:<br>: |

**DECLARATION OF E. JOSHUA ROSENKRANZ IN SUPPORT OF DEFENDANT SUPAP KIRTSAENG'S MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES**

DECLARATION OF E. JOSHUA ROSENKRANZ

I, E. Joshua Rosenkranz, declare as follows:

1. I am a member of the bar of the State of New York and the firm Orrick, Herrington & Sutcliffe, LLP ("Orrick"), counsel to defendant Supap Kirtsaeng ("Mr. Kirtsaeng") in this action. I make this affidavit in support of Mr. Kirtsaeng's Motion For Award of Attorneys' Fees and "Full Costs" Under Section 505 of the Copyright Act.

**STATEMENT**

2. I have been an appellate litigator for over twenty years and regularly handle matters in the Supreme Court of the United States. I have filed briefs in more than 60 Supreme Court cases and have presented oral argument in the Court eight times. I speak regularly about appellate and Supreme Court practice, including organizing and personally presenting Continuing Legal Education programs focused on the Court for corporate clients and for the bar more generally. I also serve frequently in moot courts as a mock Supreme Court justice to help other advocates prepare for oral argument.

3. I am the billing partner for this client and this matter, and am responsible for overseeing all attorneys' fees and disbursements charged to this matter by Orrick.

4. The core Orrick legal team working on the appeal consisted of three partners, four associates, and one paralegal. Attached hereto as Exhibit A are true and accurate biographies of the principal Orrick attorneys who worked on the appeal.

5. I served as Orrick's primary lead trial counsel. I am located in Orrick's New York office and head Orrick's Appellate Practice Group. I am *summa cum laude* graduate of Columbia University, a graduate of Case Western Reserve University and a *magna cum laude* graduate of Georgetown University Law Center. I am a former law clerk to U.S. Supreme Court Justice William J. Brennan Jr. and then-Judge Antonin Scalia on the D.C. Circuit. I have personally argued more than 170 appeals in state and federal appellate courts across the nation and have served as attorney of record in some 1,500 other appeals. I have played a leading role in more than a dozen Supreme Court cases, having argued eight in the past eight years. I was

named "Litigator of the Year" by the American Lawyer in its January 2012 edition and was named an "Appellate MVP" for 2011 by Law360. My attorney rate was $985 per hour in 2011, and $1,020 per hour in 2012 and 2013.

6. Orrick's team also consisted of two other firm partners who assisted in preparing the appeal, Annette L. Hurst ($820 per hour in 2011, and $850 per hour in 2012-13) and Lisa T. Simpson ($785 per hour in 2011 and $795 per hour in 2012-13). Both are members of Orrick's Intellectual Property Group. Annette Hurst is a partner in Orrick's San Francisco office. Ms. Hurst, a graduate of New York University School of Law and a *magna cum laude* graduate of Miami University, has been named one of the top 75 IP litigators in California by The Daily Journal every year since 2010 and in January 2013 was named "Female Litigator of the Year— West" by Benchmark Litigation. Ms Hurst has more than 20 years of experience in copyright litigation. Lisa Simpson is a partner in Orrick's New York Office. Ms. Simpson is a *cum laude* graduate of Duke University and graduated with high honors from Duke School of Law. She too has nearly 20 years of copyright experience.

7. Consistent with my own experience, these billing rates are well within the range of reasonable partner rates for large law firms in New York City. This is confirmed by recent surveys reporting on attorney rates by city. I attach a true and correct copy of one such survey from the National Law Journal as Exhibit B. The National Law Journal Survey lists the range of partner billing rates in New York City for firms of similar size as between $550 per hour and $1200 per hour.

8. Orrick's core team also included four associates, Marc R. Shapiro, Alex J. Feerst, Brian D. Ginsberg, and Nicholas F. Lenning, whose hourly rates ranged from $330 per hour to $615 per hour, depending on seniority. These rates were reasonable and consistent with rates at NYC firms of similar size during the applicable time period. *See* Exhibit B.

9. Marc R. Shapiro graduated *cum laude* from New York University School of Law in 2003. Alex J. Feerst graduated from Columbia Law School in 2009. Mr. Feerst externed for the Honorable Barbara S. Jones of the Southern District of New York and the Honorable Sonia

Case 1:08-cv-07834-DCP   Document 95   Filed 08/01/13   Page 4 of 18

Sotomayor then of the Second Circuit Court of Appeals.  Brian D. Ginsberg graduated from Columbia Law School in 2007.  Mr. Ginsberg has clerked for the Hon. Michael A. Chagares of the U.S. Court of Appeals for the Third Circuit and the Hon. Anita B. Brody of the U.S. District Court for the Eastern District of Pennsylvania.  Nicholas F. Lenning graduated for Duke Law School in 2011.  Mr. Lenning clerked for the Hon. Paul L. Friedman of the U.S. District Court for the District of Columbia.

10. Mr. Shapiro left the team in 2012 to serve as clerk to Judge Betty B. Fletcher of the U.S. Court of Appeals for the Ninth Circuit and was replaced on the team by Brian D. Ginsberg.  The requested fee amount on this motion has been adjusted to account for this change in staffing by deleting time recorded by Mr. Ginsberg spent familiarizing himself with the issues in the case and transitioning from Mr. Shapiro to Mr. Ginsberg.

11. The lead paralegal on the team, Juanita M. Greenfield, has been a legal assistant for nine years and has worked on numerous complex litigations.

12. Additional attorneys and support staff assisted with the appeal as needed, providing valuable and important assistance.  However, Orrick is only seeking attorneys' fees for the core legal team on this motion.

13. Assembling a team with this number and assortment of attorneys is typical and customary for appeals to the U.S. Supreme Court.

14. During the course of the appeal, several attorneys' standard hourly rates were increased at the beginning of the 2012 and 2013 calendar year.  Those increases were customary in the legal industry for firms of Orrick's size and were made in consultation with the industry practice as a whole.

15. The rates sought here are the standard rates that Orrick charges paying clients. Orrick surveys the market before setting our rates and has come to conclude that these rates are customary.

4

16. Pursuing an appeal before the Supreme Court requires numerous rounds of briefing (the petition for certiorari, the reply on that petition, the opening merits brief, and the reply merits brief), the identification and coordination of the amici, and the preparation for the oral argument. In my experience it is reasonable and customary to dedicate significant time to each of these important tasks. While litigating other cases before the U.S. Supreme Court, my teams have dedicated a similar number of hours.

**The Certiorari Stage**

17. My team's involvement in this case began at the petition-for-certiorari stage.

18. After the Second Circuit denied Mr. Kirtsaeng's appeal, and denied his request for hearing en banc, Mr. Kirtsaeng and his counsel enlisted Orrick for assistance in seeking review by the U.S. Supreme Court. In my experience it is very common for parties with cert-worthy issues to retain specialized appellate practitioners, particularly those specialized in appeals before the U.S. Supreme Court, to work alongside the party's current counsel to bring and argue the case before the Supreme Court.

*The Cert Petition*

19. The first thing we did in preparing the cert petition was formulate our legal argument. To be sure, our primary focus was on demonstrating that the Second Circuit's decision created a split of appellate authority, and that the issues involved were nationally and urgently important. But, as a preliminary matter, we had to craft and fully explore our actual merits position.

20. And from the beginning, we knew this was no ordinary case and that we faced an unusually difficult challenge.

21. This case presented a uniquely complex question: what is the meaning of the phrase "lawfully made under this title" in § 109(a) of the Copyright Act. While the question focuses on those five little words, the interplay (1) internally between the countless provisions of the Copyright Act and (2) externally between copyright, patent, and trademark law causes repercussions throughout intellectual property that had to be considered.

22. Two years earlier, the Supreme Court had considered the exact same question, whether the "first sale" doctrine applies to copyrighted works made abroad, in *Costco v. Omega*, 131 S. Ct. 565 (2010), and reached an impasse. With Justice Kagan recused, the Court split four to four, leaving the question unresolved. On top of this, Justice Kagan, as Solicitor General, had authored a lower-court amicus curiae brief in that case arguing *against* the side taking "our" position. In short, before any brief was submitted in this case, four justices were pre-disposed against us, with a fifth potentially leaning the same direction.

23. To combat the entrenched four-to-four split from *Costco*, we adopted a novel legal argument that was not presented previously. In *Costco*, the petitioner presented a "hybrid" approach to the first-sale doctrine: copies made overseas were subject to the first-sale doctrine *unless* the copies are subject to a foreign distributor's exclusive license to operate in a particular country. While this position sought to reconcile language from a prior Supreme Court opinion, *Quality King Distributors, Inc. v. L'Anza Research International, Inc.*, 523 U.S. 135 (1998), it was unmoored from the statutory text. Because this argument was unsuccessful, we offered a more statutorily faithful argument, but one that encountered additional problems in attempting to reconcile the Supreme Court's prior language in the *Quality King* case.

24. In light of the prior history before the Supreme Court and the new arguments presented by both the Ninth Circuit and the Respondent, we could not simply resubmit the same arguments as had been presented in *Costco*. Instead, the legislative history, legal precedent and Copyright Act had to be approached from a new perspective, requiring entirely new and substantial research. This included collecting and reviewing the entirety of the legislative history record of relevant portions of the Copyright Act and conducting legal research into a wide range of areas of the law.

25. Another critical element of our cert petition was demonstrating that the underlying issue in the case was nationally important, and that the resolution of the issue was urgently required. We drew from a wide variety of sources to make these showings, and there is

no one-size-fits-all approach. A tremendous amount of research had to be done, empirical evidence gathered and analyzed, and the like.

26. In our case, the empirical policy questions largely involved the scope of the issue (*i.e.*, how many and what industries relied upon the first-sale doctrine), and the effect of resolving that issue according to our position or Respondent's. That meant examining reams of business and manufacturing data apart from more traditional legal sources.

27. We argued that even measured against cases important enough to reach the high court, this case carried unusually high stakes: a multi-billion market, impacting everyday consumers and global corporations, hung in the balance. As Reuters noted at the time, "this is a hugely consequential issue." Reuters, Supreme Court takes another look at gray market resales, April 17, 2012, *available at* http://www.reuters.com/article/2012/04/17/us-frankel-graymarket-idUSBRE83G15H20120417 (attached as Exhibit C). If Wiley prevailed, we argued, copyright holders would gain the power to exert permanent downstream control over the sale of used copies. Meanwhile, if we prevailed, copyright holders would likely lose the ability to segment markets, resulting in a significant loss of revenue. Thus, as Reuters observed, the Court's "ultimate ruling w[ould] profoundly affect the approximately $63 billion "gray market" business." *Id*.

### *The Amicus Process*

28. The cert-stage work did not end after the cert petition was filed, however.

29. To further demonstrate the importance of the case, we coordinated with a variety of amici curiae to show (in addition to simply tell) how major players across a broad spectrum of constituencies were keenly interested in the case and want it to be resolved in the way we were urging.

30. This process was so time-consuming that it required dedicated attention separate and apart from preparing the cert petition. We had to identify the potential amici, and then develop custom-tailored pitches to present to them. Then, we had to coordinate with each amicus and among amici to ensure that each of their briefs added value to the effort and wasn't

merely duplicative of other submissions.  Additionally, this job was inherently complex simply because the whole idea was to assemble as many and as diverse a group of supporters as possible, but the coordination required grew exponentially as the number of amici got larger and larger.

      31.    We coordinated a diverse group of cert stage amici, including:

          a.    eBay
          b.    NetCoalition
          c.    the Computer & Communications Industry Association
          d.    the Internet Commerce Coalition
          e.    TechNet
          f.    NetChoice
          g.    TechAmerica
          h.    Public Knowledge
          i.    Electronic Frontier Foundation
          j.    U.S. Public Interest Research Group
          k.    the Retail Industry Leaders Association
          l.    American Free Trade Association
          m.    Quality King Distributors

      32.    Each of these amici either filed or joined in a brief supporting our cert petition.

### *Reply Brief*

      33.    After the amicus process concluded, the next step is to prepare a reply brief addressing the issues raised by the Respondent's brief in opposition to cert.  This required additional research and strategizing.  Respondent made numerous arguments, including that no "circuit split" was implicated, that the Second Circuit's opinion was consistent with Supreme Court precedent, and that the Court's review was unnecessary because nothing had changed since *Costco*.

34. In total, 5 Orrick attorneys—myself, as well as Annette L. Hurst, Lisa T. Simpson, Marc R. Shapiro, and Alex J. Feerst—spent approximately 634 hours performing the work necessary to adequately complete all the cert-stage tasks: producing the cert petition, coordinating the amicus effort, and producing the reply brief. In my experience, having represented clients in at least two dozen cert-stage matters, this expenditure of efforts was customary and reasonable.

**Merits Stage**

35. Once the Court granted cert, we proceeded to the merits stage.

*Opening Brief*

36. While we had already put considerable effort into refining our merits position, now the merits were the main event, and it became critical to formulate our position comprehensively and with full precision. Our opening brief presented four principal arguments:

   a. First, we argued that the ambiguity arising from the "lawfully made under this title" language of § 109(a) arose as much from § 602 (the importation provision) as from § 109 itself. But we argued this ambiguity had been resolved by a prior Supreme Court case, *Quality King*, with § 109 taking precedence over § 602.

   b. Second, we argued that our interpretation of "lawfully made under this title" was the most consistent with other provisions of the Copyright Act and the Copyright Act's legislative history.

   c. Third, we argued that arguments typically offered in support of Wiley's position caused havoc with other provisions of the Copyright Act. We also argued that, contrary to Wiley's assertions, our interpretation did not implicate the presumption against extraterritoriality nor was it inconsistent with language from *Quality King*.

   d. Fourth, we argued that canons of statutory interpretation and various presumptions concerning congressional intent favored our interpretation.

*The Amicus Process*

37. Also, we had to start the amicus process over again, launching a new and expanded effort, and coordinating with existing and new amici as they, too, fine-tuned their approach to the merits stage. We were fortunate enough to be able to coordinate the following amici:

      a. American Library Association

      b. The Association of College and Research Libraries

      c. The Association of Research Libraries

      d. The Association of Art Museum Directors

      e. The Art Institute of Chicago

      f. The J. Paul Getty Trust

      g. Museum Associates d/b/a Los Angeles County Museum of Art

      h. The Museum of Modern Art

      i. The San Francisco Museum of Modern Art

      j. The Solomon R. Guggenheim Foundation

      k. The Whitney Museum of American Art

      l. The Asian Art Museum, Chong-Moon Lee Center for Asian Art and Culture

      m. The Cedar Rapids Museum of Art

      n. The Cleveland Museum of Art

      o. The Columbus Museum

      p. The Currier Museum of Art

      q. The Dallas Museum of Art

      r. The Farnsworth Art Museum

      s. The Flint Institute of Arts

      t. The Georgia Museum of Art

      u. The Hunter Museum of American Art

v.   The Indiana University Art Museum

w.   The Michael C. Carlos Museum

x.   The Milwaukee Art Museum

y.   The Mint Museum

z.   The Museum of Latin American Art

aa.  The Nasher Museum of Art at Duke University

bb.  The Palmer Museum of Art

cc.  The Philbrook Museum of Art

dd.  The Portland Art Museum

ee.  The Timken Museum of Art

ff.  The Toledo Museum of Art

gg.  The Walker Art Center

hh.  Association of Service and Computer Dealers

ii.  Costco Wholesale Corporation

jj.  eBay Inc.

kk.  Google, Inc.

ll.  Center for Democracy & Technology

mm.  CHEGG

nn.  Computer & Communications Industry Association

oo.  Internet Commerce Coalition

pp.  NetCoalition

qq.  NetChoice

rr.  TechAmerica

ss.  Entertainment Merchants Association

tt.  National Association of Recording Merchandisers

uu.  Goodwill Industries International, Inc.

vv.  Powell's Books Inc.

ww.    Strand Book Store, Inc.

xx.    Half Price Books, Records, Magazines, Inc.

yy.    Harvard Book Store Inc.

zz.    Public Knowledge

aaa.    Electronic Frontier Foundation

bbb.    American Association of Law Libraries

ccc.    Special Libraries Association

ddd.    U.S. Public Interest Research Group

eee.    Retail Litigation Center, Inc.

fff.    National Association of Chain Drug Stores

ggg.    American Free Trade Association

hhh.    International Imaging Technology Council

iii.    Quality King Distributors, Inc.

jjj.    Professor Howard Abrams

kkk.    Professor Margreth Barrett

lll.    Professor Annemarie Bridy

mmm.    Professor Irene Calboli

nnn.    Professor Andrew Chin

ooo.    Professor Margaret Chon

ppp.    Professor Ralph Clifford

qqq.    Professor William Gallagher

rrr.    Professor Shubha Ghosh

sss.    Professor Llewellyn Gibbons

ttt.    Professor Eric Goldman

uuu.    Professor Faye Jones

vvv.    Professor Ariel Katz

www.    Professor Yvette Liebesman

      xxx.    Professor Deirdre Mulligan

      yyy.    Professor Aaron Perzanowski

      zzz.    Professor David Post

      aaaa.    Professor Blake Reid

      bbbb.    Professor Pamela Samuelson

      cccc.    Professor Jason Schultz

      dddd.    Professor Jessica Silbey

      eeee.    Professor Katherine Strandburg

      ffff.    Professor Rebecca Tushnet

      gggg.    Professor Jennifer Urban

      hhhh.    Professor Ryan Vacca

*Reply Brief*

38. Respondent filed its response brief, and, also like during the cert stage, we expended considerable effort determining the best way to address Respondent's points in our reply brief.

39. But this reply brief required more effort still, because, unlike at the cert stage, the respondent enlisted amici supporting its position, and we had to respond to those arguments, as well.

40. Most notably, the U.S. Solicitor General participated as one of respondent's amici and filed a brief against us. The SG is the most influential litigant before the Supreme Court. Thus, even though the SG was not a formal party to the case, its brief had to be addressed with the same level of scrutiny and exaction as Wiley's brief. And the SG made some inventive arguments that were not made by Wiley and therefore required substantial new legal and historical work. For example, instead of making a statutory interpretation argument, the SG presented an argument rooted in common law: that a century-old Supreme Court case, *Bobbs-Merrill*, had determined the extent of the "right to vend" which had been incorporated into the Copyright Act when it was passed. Thus, the SG argued that the "right to vend" provided a

13

separate limitation on copyright holders, before the first sale doctrine is implicated.  This unique argument had not been presented by any party in either *Costco* or *Kirtsaeng*, or even by the SG himself in previous cases.

41. In total, 7 Orrick attorneys and support staff—myself, as well as Annette L. Hurst, Lisa T. Simpson, Marc R. Shapiro, Alex J. Feerst, Brian D. Ginsberg, Nicholas F. Lenning, and paralegal Juanita M. Greenfield—spent approximately 1399 hours performing the work necessary to adequately complete the opening brief and coordinate the amicus effort for the merits portion of the case, and approximately 678 hours producing the reply brief.  In my experience, this expenditure of effort was typical for this stage of a U.S. Supreme Court appeal.

**Oral Argument**

42. After briefing was complete, the next step was to focus on oral argument.  And even though the issues have already been narrowed and focused by the briefing, preparing for oral argument was a huge undertaking.  The Court didn't have to stick to any script; it could ask about anything and everything:  doctrinal legal issues, policy implications, factual questions, and everything else on the spectrum.  To prepare for this, my team went back through the Supreme Court briefs—party and amicus, cert and merits, amounting to approximately 1,000 of pages of material across 34 briefs—the joint appendix and cert petition appendix, the briefing and appendices in the Second Circuit, and the record in the district court to prepare for all conceivable fact questions, procedure questions, law questions, policy questions, practical questions, and multi-layered hypotheticals.

43. Thereafter, I organized and prepared for several moot courts, inviting other Orrick lawyers and sometimes outside parties to judge and critique my oral argument.  Each moot consisted of an "argument" session of an hour or two, where the panelists played the role of Supreme Court justices asking me questions, and an approximately-one-hour postmortem, where the entire assembled group discussed the argument and offers advice and comments.  It is standard practice among appellate specialists to perform moot courts while preparing for a Supreme Court case.

44. For this particular case, we arranged three moot courts.

45. The first moot was an internal one, with Orrick lawyers and outside co-counsel serving as the mock justices.

46. The second moot was held at the Georgetown University Law Center's Supreme Court Institute ("SCI"). The panel here included a diverse group of outside lawyers: private-practice appellate specialists, copyright professors, alumni of the SG's office, and more.

47. The third moot was held at the offices of Public Citizen. The panel for this moot consisted of copyright experts and private-practice appellate specialists including Roy Englert, the lawyer who argued "our" position in *Costco*.

48. After the moots, I continued to dialogue with the Orrick team and review and revise my preparatory materials. This review and revision continued up to (and, indeed, during the early morning of) the day of argument.

49. In my experience this type of preparation is typical for an argument before the Supreme Court.

50. In total, 6 Orrick attorneys and support staff—myself, as well as Annette L. Hurst, Lisa T. Simpson, Alex J. Feerst, Brian D. Ginsberg, Nicholas F. Lenning, and paralegal Juanita M. Greenfield—spent approximately 432 hours helping prepare me for oral argument.

**The Decision**

51. The Supreme Court decided the case in our favor in a six-to-three majority opinion authored by Justice Breyer. It held that the first-sale doctrine applies to copyrighted goods no matter where they were manufactured.

52. The media widely recognized this result as extraordinary. They noted that Mr. Kirtsaeng overcome a U.S. government that "tried, and failed, to convince the court to apply a narrower definition to the first-sale doctrine," Daniel Fisher, Forbes, Supreme Court Upholds Right To Sell Foreign-Published Books, available at http://www.forbes.com/sites/danielfisher/2013/03/19/supreme-court-upholds-right-to-sell-foreign-published-books (attached as Exhibit D), and that the decision was

"likely worth billions, even trillions, of dollars" and had "repercussions that extend from trade policy to yard sales."  Nina Totenberg, NPR, Supreme Court OKs Discounted Resale of "Gray Market" Goods, available at http://www.npr.org/blogs/thetwo-way/2013/03/19/174757355/supreme-court-oks-discounted-resale-of-gray-market-goods (attached as Exhibit E).  News outlets recognized it as a "victory for those who buy and sell books, movies, music, and artwork, and perhaps even furniture, electronics, automobiles and clothing—anything that may be considered 'intellectual property.'"  Bill Mears, CNN, High court rules for seller in copyright dispute over foreign-made goods, available at http://www.cnn.com/2013/03/19/us/supreme-court-copyright-dispute/index.html?iref=allsearch (attached as Exhibit F).  The result "surprised legal experts from both camps."  April Dembosky, Financial Times, Publishers mull tech tactics after legal defeat over imports, available at http://blogs.ft.com/tech-blog/2013/03/publishers-mull-tech-tactics-after-legal-defeat-over-imports (attached as Exhibit G).  It was called a "major development, both for the industry, and for the broader debate over copyright in the digital age."  Andrew Albanese, Publisher's Weekly, What Does Kirtsaeng v. Wiley Mean For the Industry?, available at http://www.publishersweekly.com/pw/by-topic/industry-news/publisher-news/article/56491-a-textbook-case.html (attached as Exhibit H).

53. Additionally, SCOTUSblog lauded the value of the oral argument in particular.  It opined that "[t]his well might be the rare case of a victory at oral argument."  Ronald Mann, SCOTUSblog, Opinion analysis: Justices reject publisher's claims in gray-market copyright case, available at http://www.scotusblog.com/2013/03/opinion-analysis-justices-reject-publishers-claims-in-gray-market-copyright-case/ (attached as Exhibit I).

54. All told, 7 Orrick attorneys and support staff spent approximately 3,144 hours litigating this matter from start to finish in the Supreme Court.  In my experience, that expenditure of effort was customary and reasonable for such an appeal.

**SUMMARY OF TOTAL EXPENDITURES**

55. The hourly rates for the partners working on this matter, and the hours worked, were as follows:

| ATTORNEY | 2011 RATE | 2012 RATE | 2013 RATE | HOURS |
|---|---|---|---|---|
| Annette L. Hurst | $820 per hour | $850 per hour | $850 per hour | 227.80 |
| E. Joshua Rosenkranz | $985 per hour | $1,020 per hour | $1,020 per hour | 455.10 |
| Lisa T. Simpson | $785 per hour | $795 per hour | $795 per hour | 239.00 |

56. The hourly rates for the associates working on this matter, and the hours worked, were as follows:

| ATTORNEY | 2011 RATE | 2012 RATE | 2013 RATE | HOURS |
|---|---|---|---|---|
| Alex J. Feerst | $330 per hour | $450 per hour | $450 per hour | 524.00 |
| Brian D. Ginsberg | n/a | $615 per hour | $615 per hour | 346.20 |
| Nicholas F. Lenning | n/a | $355 per hour | $450 per hour | 431.70 |
| Marc R. Shapiro | $530 per hour | $575 per hour | n/a | 711.25 |

57. The hourly rates for the support staff working on this matter, and the hours worked, were as follows:

| PARALEGAL | 2011 RATE | 2012 RATE | 2013 RATE | HOURS |
|---|---|---|---|---|
| Juanita M. Greenfield | n/a | $250 per hour | n/a | 208.65 |

58. Across all Orrick attorneys and support staff, the total number of hours worked was 3,143.70.

59. Attached hereto as Exhibit J is a spreadsheet generated from billing records for this matter, as maintained by Orrick in the regular course of business. The spreadsheet reflects

17

Orrick attorneys' and paralegal's time spent on this matter. The spreadsheet includes an itemized, chronological list of each attorney's and paralegal's time recorded, along with corresponding detailed descriptions for the work performed. As noted above, we have removed from this spreadsheet all non-core timekeepers and additional time to account for personnel changes and other billing inefficiencies. As indicated on the spreadsheet, the fees spent on this matter total $1,884,230.

60. Attached hereto as Exhibit K is a spreadsheet, created from invoices generated for this matter, reflecting disbursements generated in this matter related to the appeal. The disbursements include, for example, outside vendor costs, word processing and document costs, travel expenses, and telephone and other communication costs.

61. The total amount of disbursements sought by Orrick is $40,412.54.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 31st day of July, 2013, at New York, New York.

*[signature]*
E. Joshua Rosenkranz